UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| DEATRA FRAZIER, | ) | No. ED CV 10-01811-VBK |
| | ) | |
| Plaintiff, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| v. | ) | |
| | ) | (Social Security Case) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court for review of the decision by the Commissioner of Social Security denying Plaintiff's application for disability benefits.  Pursuant to 28 U.S.C. §636(c), the parties have consented that the case may be handled by the Magistrate Judge.  The action arises under 42 U.S.C. §405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the record before the Commissioner.  The parties have filed the Joint Stipulation ("JS"), and the Commissioner has filed the certified Administrative Record ("AR").

Plaintiff raises the following issues:

1.   Whether the Administrative Law Judge ("ALJ") properly

1                    considered the treating physician's opinion; and

2      2.    Whether there is a Dictionary of Occupational Titles ("DOT")

3               inconsistency in the ALJ's holding that Plaintiff can

4               perform the jobs of Small Products Assembler II and Cleaner,

5               Housekeeping.

6  (JS at 2-3.)

7

8      This Memorandum Opinion will constitute the Court's findings of

9  fact and conclusions of law.  After reviewing the matter, the Court

10  concludes that the decision of the Commissioner must be affirmed.

11

12                            **I**

13         **THE ALJ PROPERLY CONSIDERED THE OPINION**

14         **OF TREATING PSYCHIATRIST DR. LASALA**

15      In Plaintiff's first issue, she asserts that the ALJ did not give

16  a proper evaluation of Plaintiff's mental condition, in particular,

17  failing to adequately consider the opinions of Plaintiff's treating

18  psychiatrist, Dr. Lasala.

19

20      **A.**    **ALJ Decision and ALJ Hearing**.

21      At the hearing before the ALJ, which occurred on December 17,

22  2009 (AR 22-52), Plaintiff appeared, testified, and was represented by

23  counsel.   The ALJ called upon the services of Dr. Glassmeyer, a

24  medical expert ("ME"), and also a vocational expert ("VE").  The ME

25  testified that he would limit Plaintiff to simple, repetitive tasks,

26  no interaction with the public, only non-intense interactions with

27  coworkers and supervisors, no tasks requiring hypervigilance, and no

28  fast-paced work. (AR 31.)  These conclusions were reached based upon

the ME's review of the primary treatment records from Dr. Lasala, which the ME interpreted as showing that Plaintiff's symptoms are relatively well-controlled with treatment, although she has had a few decompensations. (AR 32.)   The ME testified as to various mental status examinations which were conducted. (AR 32-34.)   The ME testified that some of the Global Assessment of Functioning ("GAF") scores "don't match the mental status examinations that were given, or the diagnosis where [Dr. Lasala] consistently diagnoses [sic] is made bipolar I disorder depressed moderate.   But the mental status examinations are consistent throughout.   They're checked off with the same symptoms checked each time.   And the GAF scores are the same." (AR 35-36.)

In his decision, the ALJ determined that Plaintiff has severe impairments which include bipolar disorder (AR 10).   He found that her condition did not meet any of the Listings under the mental health categories, and further evaluated the mental health criteria as required (see, infra): mild restriction in activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence or pace; and one to two episodes of decompensation of extended duration. (AR 11.)

Considering the evidence, the ALJ limited Plaintiff to performing simple repetitive tasks, no interaction with the public, non-intense interactions with coworkers and supervisors; no hypervigilance; no fast-paced work. (Id.)

The ALJ further indicated he had considered the opinions of treatment providers, and included in that the various GAF scores, giving them limited weight. (AR 14.)  Noting that a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessive

3

rituals, frequent shoplifting) or any serious impairment in social occupational, or school functioning" (AR 14), the ALJ found that the GAF scores were generally not consistent with the mental status examinations she had received.

**B.   Applicable Law**.

    **1.   Mental Impairments**.

In evaluating mental impairments, 20 C.F.R. §404.1520a(c)(3)(4) and §416.920a(c)(3)(4) mandate that consideration be given, among other things, to activities of daily living ("ADLs"), social functioning; concentration, persistence, or pace; and episodes of decompensation. These factors are generally analyzed in a Psychiatric Review Technique Form ("PRTF"). The PRTF is used at Step Three of the sequential evaluation to determine if a claimant is disabled under the Listing of Impairments; however, the same data must be considered at subsequent steps unless the mental impairment is found to be not severe at Step Two. See SSR 85-16.

20 C.F.R. §§404.1520a(c)(1) and 416.920a(c)(1) require consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment."[1]

---

[1]   20 C.F.R. §404.1545(c) and §416.945(c) also require consideration of "residual functional capacity for work activity on a regular and continuing basis" and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work (continued...)

1    SSR 85-16 suggests the following as relevant evidence:

2         "History, findings, and observations from medical

3    sources (including psychological test results), regarding

4    the presence, frequency, and intensity of hallucinations,

5    delusions or paranoid tendencies; depression or elation;

6    confusion or disorientation; conversion symptoms or phobias;

7    psycho-physiological symptoms, withdrawn or bizarre

8    behavior; anxiety or tension. Reports of the individual's

9    activities of daily living and work activity, as well as

10   testimony of third parties about the individual's

11   performance and behavior. Reports from workshops, group

12   homes, or similar assistive entities."

13

14   It is also required under §404.1520a(c)(2) and §416.920a(c)(2)

15   that the ALJ must consider the extent to which the mental impairment

16   interferes with an "ability to function independently, appropriately,

17   effectively, and on a sustained basis" including "such factors as the

18   quality and level of [] overall functional performance, any episodic

19   limitations [and] the amount of supervision or assistance []

20   require[d]."

21   Pursuant to the September 2000 amendments to the regulations

22   which modify 20 C.F.R. §404.1520a(e)(2) and §416.920a(e)(2), the ALJ

23   is no longer required to complete and attach a PRTF. The revised

24   regulations identify five discrete categories for the first three of

25   four relevant functional areas: activities of daily living; social

26   functioning; concentration, persistence or pace; and episodes of

27   ────────────

28        [1](...continued)
     setting."

5

decomposition.  These categories are None, Mild, Moderate, Marked, and Extreme.  (§404.1520a(c)(3), (4).)  In the decision, the ALJ must incorporate pertinent findings and conclusions based on the PRTF technique.  §404.1520a(e)(2) mandates that the ALJ's decision must show "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section."

The Step Two and Three analyses (see Decision at AR 53-54) are intended to determine, first, whether a claimant has a severe mental impairment (Step Two), and if so, whether it meets or equals any of the Listings (Step Three).  It is also required under §404.1520a(c)(2) and §416.920a(c)(2) that the ALJ must consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such factors as the quality and level of [] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [] require[d]."

These findings and conclusions are relevant to the Step Two and Three analysis of whether a claimant has a severe mental impairment, and if so, whether it meets or equals any of the Listings. (See 20 C.F.R. Part 4, subpart p, App. 1.)  The discussion in Listing 12.00, "Mental Disorders," is relevant:

"The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity.

The functional limitations in paragraphs B and C must be the result of the mental disorders described in the diagnostic description, that is manifested by the medical findings in paragraph A.

In Listing 12.00C, entitled 'Assessment of Severity,' it is stated that, 'we assess functional limitations using the four criteria in paragraph B of the Listings: Activities of daily living; social functioning; concentration; persistence, or pace; and episodes of decompensation. Where we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme."

Social Security Ruling ("SSR") 96-8p makes the same point in distinguishing evidence supporting a rating of mental severity at Step Two, a Listing level impairment at Step Three, and the determination of an individual's MRFC at Step Four.

### 2.   **GAF Scores**.

The GAF scale is intended to reflect a person's overall level of functioning at or about the time of the examination, not for a period of at least 12 consecutive months, which is required for a finding of impairment or disability. (See 20 C.F.R. §§416.905, 416.920(c)(2006).)

GAF scores are intended to be used for clinical diagnosis and treatment, and do not directly correlate to the severity assessment set forth in Social Security regulations. (See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000), and American Psychiatric

1    Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders, Text</u>
2    <u>Revision</u> 33 (4th Ed. 2000).

3

4        **C.    <u>Analysis</u>**.

5        Plaintiff's primary concern is that the ALJ did not give a fair
6    evaluation of Dr. Lasala's assessments.  But the ALJ agreed with Dr.
7    Lasala that Plaintiff has a severe impairment of bipolar disorder, and
8    in fact, the ALJ assessed significant functional limitations, may of
9    which are supported by Dr. Lasala's findings.  Dr. Lasala, of course,
10   never opined that Plaintiff is disabled from working.  Moreover, as
11   the Commissioner correctly notes, many of Dr. Lasala's periodic
12   reports indicate relatively normal mental status examinations. (<u>See</u>,
13   <u>e.g.</u>, AR 31-34, 450-451, 453, 464, 467.)   Other mental status
14   examinations make no comment whatsoever as to the relevant criteria of
15   a mental status exam. (<u>See</u>, <u>e.g.</u>, AR 454, 462, 463.)   Further,
16   Plaintiff cannot legitimately disagree that the ALJ correctly noted
17   Dr. Lasala's conclusion that when she is complying with her
18   medications, her condition is significantly ameliorated. As Plaintiff
19   notes, Dr. Lasala periodically adjusted her medications, but that fact
20   alone does not lean toward a finding of disability.

21       The Court also notes that many of the statements contained in the
22   various mental status examinations completed by Dr. Lasala constituted
23   Plaintiff's own subjective reporting.  In this respect, they are often
24   at odds with Dr. Lasala's own observations.

25       As to the GAF scores, while Plaintiff seems to largely rely upon
26   them as an indicator of disability, she fails to address the ME's
27   testimony, adopted by the ALJ, that these scores are not consistent
28   with the records as a whole. (<u>See</u> AR at 14.)

1    Based on the foregoing reasons, the Court cannot find error in
2    the ALJ's evaluation of Dr. Lasala's treatment notes and opinions.
3    The ALJ properly found that Plaintiff has a severe impairment of
4    bipolar disorder, and assessed reasonable and relevant functional
5    restrictions based on the evidence in the record.

6

7                                   **II**

8                    **THERE IS NO STEP FIVE ERROR**

9    In Plaintiff's second issue, she asserts that there is an
10   inconsistency at Step Five of the sequential evaluation process (<u>see</u>
11   AR at 9-10), in that the two jobs identified by the ALJ as being
12   within Plaintiff's mental residual functional capacity ("RFC") have
13   mental functional requirements which exceed Plaintiff's capacity, also
14   as found by the ALJ.

15   At the hearing, the ALJ took testimony from a VE, and posited a
16   hypothetical which incorporated Plaintiff's mental RFC. (AR 50.)  With
17   this in mind, the VE identified work as a Small Products Assembler II,
18   DOT code 739.687-030, and also a Cleaner, Housekeeping, DOT code
19   323.687-014.  The VE testified her conclusions are consistent with the
20   DOT. (AR 51.)  Plaintiff asserts that these jobs contain requirements
21   that are beyond her mental RFC.  She contends, generally, that the job
22   of Small Products Assembler II would require her to be exposed to
23   fast-paced work like an assembly line, and the job of Cleaner,
24   Housekeeping would require interaction with the public.

25   The problem with Plaintiff's analysis is that she is making
26   inferences from the actual job descriptions in the DOT which are not
27   contained in these job descriptions.  For example, while Plaintiff
28   speculates that the job of Cleaner, Housekeeping requires interaction

with the public, as defined in the DOT, it is strictly an institutional occupation.  The ALJ was certainly entitled to rely upon the testimony of the VE to identify that as an available job.  See Moore v. Apfel, 216 F.3d 864, 869-70 (9th Cir. 2000).

Similarly, Plaintiff seems to rely upon speculation to make her contention that the job of Small Products Assembler would require fast-paced work.  There is no such statement of description in the DOT listing of that job.

Finally, the DOT descriptions are not the last word in the matter.  As defined in Social Security Ruling ("SSR") 00-4p, the DOT listing indicates the maximum requirements of occupations as they are generally performed.  It does not address the range of requirements of a particular job as performed in specific settings.  As SSR 00-4p recognizes, a VE or similar reliable source can provide more specific information about jobs or occupations than the DOT does in its own descriptions. (Id.)

Plaintiff's arguments, founded upon her own speculation, do not create an inconsistency or deviance between the DOT descriptions and her RFC.  Case law cited by Plaintiff is therefore inapplicable. (See JS at 16.)

The ALJ's Step Five conclusions are supported by substantial evidence.

The decision of the ALJ will be affirmed.  The Complaint will be dismissed with prejudice.

**IT IS SO ORDERED.**


DATED: August 3, 2011                    /s/
                                VICTOR B. KENTON
                                UNITED STATES MAGISTRATE JUDGE